## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DELAWARE RIVERKEEPER** | : | |
| **NETWORK, et al.,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civ. No. 18-2447** |
| | : | |
| **SUNOCO PIPELINE L.P.,** | : | |
| **Defendant.** | : | |

---

**Diamond, J.**                                                    **April 16, 2020**

<u>**MEMORANDUM**</u>

The Delaware Riverkeeper Network and "Riverkeeper" Maya van Rossum charge that Sunoco Pipeline L.P. violated the Clean Water Act when the Company did not seek a federal permit for its Mariner East II Pipeline Project after regulatory authorities advised that because only a nearly identical state permit was required, they would not issue a federal permit.  Surely Plaintiffs' allegation refutes itself.  Even the byzantine regime of environmental regulation imposes neither such a pointless requirement nor a penalty for its "violation."  Because Plaintiffs' dispute is really with the regulatory authorities and not Sunoco, I will grant Sunoco's Motion for Summary Judgment, deny Plaintiffs' Cross-Motion, and dismiss this matter.

### I.      LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of any genuine issue of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  An issue is "genuine" if there is evidence on which a reasonable fact finder could base a verdict for the nonmoving party.  <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the case's outcome under governing

law.  Id. (citing Anderson, 477 U.S. at 248).  I must view the facts and draw all reasonable inferences in the opposing party's favor, although "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010); see Anderson 477 U.S. at 255.

If the moving party satisfies its burden, the opposing party must then show a disputed material factual issue.  It is not enough simply to reiterate allegations or "show some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must establish a triable issue by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).

Finally, summary judgment is appropriate if the responding party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## II.    REGULATORY FRAMEWORK

The Clean Water Act is intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); Am. Mining Cong. v. EPA, 965 F.2d 759, 762 (9th Cir. 1992).  It does so primarily by "controlling 'point source' pollution": the discharge of industrial and municipal waste (and other substances) into navigable waters.  Am. Mining Cong., 965 F.2d at 762.  The Act authorizes citizen suits "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation."  33 U.S.C. § 1365(a)(1).  A

2

citizen may thus "bring an action under the CWA against any person who is allegedly discharging a pollutant without a [National Pollution Discharge Elimination System] permit." Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 559 (5th Cir. 1996).

Under the CWA, the states set water quality standards employing federal criteria. See 33 U.S.C. § 1313(a).  The Act thus "anticipates a partnership between the States and the Federal Government." Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992).  Pennsylvania's Department of Environmental Protection "is primarily responsible for . . . water quality regulation" in the Commonwealth. Telford Borough Auth. v. EPA, 2013 WL 6047569, at *1 (E.D. Pa. Nov. 15, 2013).

"[T]he discharge of any pollutant by any person" is unlawful unless done in accordance with CWA limitations.  33 U.S.C. § 1311.  The Act thus allows permitting for specified activities, such as dredging or discharging substances from point sources.  The National Discharge Pollutant Elimination System provides the principal means of regulating stormwater discharges from industrial activity.  An NPDES permit is required to "add" pollutants to navigable waters from a "point source"—a "confined and discrete conveyance, including . . . any pipe, ditch, [or] channel." 33 U.S.C. § 1362(14); id. §§ 1311(a), 1362(12), 1362(14).  Surface runoffs following construction work are "point sources." See 40 C.F.R. § 122.2.

Every NPDES permit has two broad requirements: (1) the point source must employ either the "best conventional" or "best available" technology to limit pollution; and (2) permit holders may not exceed effluent limitations set by the states.  See id. § 1311(b).  Absent an exception, an NPDES permit must be obtained before pollutants are discharged from any point source into the navigable waters of the United States.

Although the Environmental Protection Agency may prescribe conditions and issue

NPDES permits, states also administer their "own permit program[s] for discharges into navigable waters within [their] jurisdiction[s]." Id. § 1342(b); see 40 C.F.R. § 123 (providing state program requirements). Significantly, once the EPA approves a state's permitting program, the Act "*suspends the availability of federal NPDES permits*." Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1525 (11th Cir. 1996) (emphasis added); see 33 U.S.C. § 1342(c)(1). Pennsylvania has adopted such a program. Pursuant to a Memorandum of Agreement between the EPA and the Commonwealth, working with County Conservation Districts, DEP administers Pennsylvania's NPDES permitting. 25 Pa. Code § 92a; see Borough of Bedford v. Commonwealth, 972 A.2d 53, 58 n.3 (Pa. Commw. Ct. 2009). Under the MOA, the EPA closely supervises the Department's NPDES permitting activities. For instance, DEP must: provide the EPA with all draft permits; keep a file available for EPA inspection that includes exhaustive information about each permittee; and submit all data to the EPA that would allow it to evaluate the Department's administration of the NPDES program. (Memorandum of Agreement Between the Commonwealth of Pennsylvania and the United States Environmental Protection Agency Region III (Rev. May 7, 1991) at 2, Ex. 2 to Murin Aff., Ex. 1 to Def.'s Mot. Summ. J.) The EPA can object to the Department's permitting actions and require it to take corrective measures. (Id. at 2–3; see 33 U.S.C. § 1342(d); So. Cal. All. of Publicly Owned Treatment Works v. EPA, 853 F.3d 1076, 1078 (9th Cir. 2017). This degree of supervision and scrutiny ensures that the Department and EPA interpret and apply the CWA and its regulations consistently. Cf. Wisconsin v. EPA, 266 F.3d 741, 749 (7th Cir. 2001) ("[T]he EPA supervises all standards and permits.").

Pennsylvania administers several NPDES programs, including those regulating stormwater and agricultural discharges, sewer systems, and industrial waste. See, e.g., DEP, NPDES and National Pollution Discharge Elimination System WQM Permitting Programs (2020),

https://tinyurl.com/rphwewb.

Congress has enacted "certain exceptions" to the prohibition on the discharge of pollutants. Nw. Envtl. Advocates v. EPA, 537 F.3d 1006, 1010 (9th Cir. 2008).  Chief among them (for purposes of this dispute) is an exemption from NPDES requirements for oil and gas development stormwater discharges.  No NPDES permit is thus required for

> ***discharges of stormwater runoff*** from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

Pub. L. No. 100-4, 101 Stat. 7, 33 U.S.C. § 1342(l)(2) (emphasis added).  This provision exempts from permit requirements certain projects causing uncontaminated "discharges of stormwater runoff."  Id.  The EPA (or DEP) has discretion to determine when stormwater contamination occurs "with respect to the substances listed in the statute, i.e., overburden, raw materials, waste products, etc."  Nat. Res. Def. Council v. EPA, 966 F.2d 1292, 1307 (9th Cir. 1992); see H.R. Rep. No. 99-1004, at 151.

The "[o]il and gas" activities described in the § 1342(l)(2) exception were defined by the Energy Policy Act of 2005 to include pipeline construction.  33 U.S.C. § 1362(24); see Sierra Club v. State Water Control Bd., 898 F.3d 383, 391 (4th Cir. 2018) ("[T]he CWA exempts natural gas pipeline construction projects from regulation.") (citing 33 U.S.C. § 1342(l)(2)).  The Energy Policy Act's amendments explicitly broadened the exception's scope.  Nat. Res. Def. Council v. EPA, 526 F.3d 591, 599 (9th Cir. 2008).

The EPA created a regulatory exception to the CWA's pipeline exemption that restores certain default permitting requirements.  See 40 C.F.R. § 122.26(c)(1)(iii).  Under this "exception

to the exemption," an oil and gas "facility" must obtain an NPDES permit if it "[c]ontributes to a violation of a water quality standard" as defined by state law.  Id.   The applicable Pennsylvania standard provides that "[w]ater may not contain substances attributable to point or nonpoint source discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life."  25 Pa. Code § 93.6; see Telford Borough Auth., 2013 WL 6047569, at *3.

DEP requires oil and gas pipeline builders to obtain Erosion and Sediment Control Permits, which the Commonwealth developed in 2006 after Congress added the § 1342(l)(2) exception.  25 Pa. Code § 102.5(c) ("A person proposing oil and gas activities that involve 5 acres (2 hectares) or more of earth disturbance over the life of the project shall obtain an E&S permit under this chapter prior to commencing the earth disturbance activity.").  Issued under Chapter 102 of the Department's regulations, E&S permits "minimize the potential for accelerated erosion and sedimentation and manage post construction stormwater" through best management practices.  Id. § 102.2(a).  Like their NPDES siblings, E&S permits are thus intended to protect water quality. See id. § 102.4(b).  To that end, the permittee must develop and implement an E&S Plan

> prepared by a person trained and experienced in E&S control methods and techniques, . . . [to]: (i) Minimize the extent and duration of the earth disturbance[;] (ii) Maximize protection of existing drainage features and vegetation[;] (iii) Minimize soil compaction[; and] (iv) Utilize other measures or controls that prevent or minimize the generation of increased stormwater runoff.

Id. § 102.4(b)(3)–(4).   The Plan must detail the project's likely stormwater flow, including "[s]upporting calculations" and "drawings."   Id. § 102.4(b)(5)(viii)–(ix).   The Plan must also provide for "inspection of [Best Management Practices] on a weekly basis and after each stormwater event." Id. § 102.4(b)(5)(x).  Finally, permittees must make necessary repairs and submit written reports outlining their inspections and actions.

6

### III.    FACTS

Plaintiffs urge that "[t]he material facts are not in dispute."  (Pls.' Mot. Summ. J. 1, 4, 6.)
Relying on the Parties' statements of undisputed facts and discovery documents, I have resolved
the very few apparent factual disputes in Plaintiffs' favor and construed the evidence most
favorably to them.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005);  (Doc.
Nos. 199, 200, 204.)  At summary judgment, "it is inappropriate . . . to . . . make credibility
determinations."  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.
1992).

Plaintiffs contend that "Sunoco has not made every good-faith effort to comply with the"
Clean Water Act.  (Pls.' Opp'n 19.)  Yet, the record abounds with examples of Sunoco's extensive
cooperation with DEP.   Accordingly, I here provide a detailed description of ME2's
comprehensive regulation—although it could have been vastly more detailed.

#### Murin Affidavit

Some four months before seeking summary judgment, Sunoco propounded the affidavit of
DEP official Kenneth Murin, who had previously testified about ME2 before the Environmental
Hearing Board.  Murin describes the Commonwealth's permitting practices (including its NPDES
programs), its regulation of ME2's construction, and the steps Sunoco took to obtain permits for
ME2.   As the Department's Environmental Program Manager, Murin helped develop and
implement DEP's Erosion and Sediment Control regulations.  He is experienced in regulating
pollution associated with construction stormwater management.   (Murin Aff. ¶ 2.)   The
Department authorized Murin to compose and submit the affidavit.  (Id. ¶ 30.)

Plaintiffs urge me to disregard the Murin affidavit because it does not comply with the
Federal Rules' "personal knowledge" requirement.  (Pls.' Resp. to Def.'s SUMF ¶ 3); see Fed. R.

Civ. P. 56(c)(4).   This is simply incorrect.   When an organization provides discovery, "the information sought must be obtained from natural persons who can speak for" the organization. 8A Wright & Miller, Federal Practice and Procedure § 2103 (3d ed. Aug. 2019 update).   DEP authorized Murin to speak for the organization.   As the Sixth Circuit has explained, "[t]he personal knowledge requirement works differently in this setting."   Lloyd v. Midland Funding, LLC, 639 F. App'x 301, 305 (6th Cir. 2016).   Accordingly,

> there is no obligation to select a person with personal knowledge [of all events in question] so long as the [organization] proffers[s] a person who can answer regarding information known or reasonably available to the organization.

Id. (internal quotation marks, citation, and emphasis omitted).   This is commonly done when an organization authorizes a person to speak on its behalf during a Rule 30(b)(6) deposition.   See, e.g., Costa v. County of Burlington, 254 F.R.D. 187, 189 (D.N.J. 2008).

The Department selected an appropriate affiant in Murin, whose declaration underscores that he is indeed knowledgeable of the matters he addresses.   Had Plaintiffs wished to challenge Murin's knowledge or authority, they could have taken his deposition or that of any other Department official.   Plaintiffs apparently took no such steps.   I will thus consider the facts to which Murin swears, most of which Plaintiffs do not even now dispute.

### The Mariner East II Pipeline Project

ME2 will transport propane, butane, and ethane across Pennsylvania.   (Def.'s Statement of Undisputed Material Facts ¶¶ 8–10, Doc. No. 45-1; Pls.' Resp. to Def.'s SUMF ¶¶ 8–10, Doc. No. 50-1.)   Construction began in 2017 and was substantially complete by April 2019.   (Id. ¶ 25; Deposition of Larry Gremminger at 10:20–22, Ex. YY to Pls.' Mot. Summ. J.)   The Project consists of two parallel pipelines—one 20 inches in diameter, the other 16 inches—running 254.6 miles across the Commonwealth.   (Defendant's Army Corps of Engineers Section 404 Permits at 1, Ex.

10 to Def.'s Mot. Summ. J.)  ME2's construction has affected the wetlands of numerous Pennsylvania counties.  (Id. (noting that ME2 required the "construction of 493 water and/or wetlands crossings").)

Throughout, Sunoco has employed "Horizontal Directional Drilling."  (Pls.' Statement of Undisputed Material Facts, Doc. No. 47-1 ¶ 16; Def.'s Resp. to Pls.' SUMF, Doc. No. 49-1 ¶ 16.) This "is a steerable trenchless method of installing underground pipe, conduit, or cable in a shallow arc along a prescribed bore path by using a surface launched drilling rig, with minimal to no impact along the bore path."  (HDD Inadvertent Return Assessment, Preparedness, Prevention and Contingency Plan at 2, Ex. 13 to Def.'s Mot. Summ. J.)  HDD avoids obstacles, including waterways, making it particularly useful during ME2's construction.  HDD recirculates drilling fluids (fresh water mixed with bentonite clay and other nonhazardous viscosifiers) to weaken the drilled soil, transport drilled spoil (excavated soil and rock cuttings), clean and cool the cutters, and transmit hydraulic power.  (Id.)  It is possible that the drilling fluid, which collects sand and silt, will "inadvertently return" to ground water or surrounding wetlands due to loss of circulation during HDD, thus producing "IRs."  (Id. at 3 ("[T]he environment may be impacted if the [drilling] fluid inadvertently returns to the surface at a location on a waterway's banks, within a waterway or wetland, or other potential receptor.").)

Even though DEP allows only approved, nontoxic additives to drilling fluid, it characterizes IRs as "industrial waste." (March 16, 2018 Notice of [IR] Violation, Ex. R to Pls.' Mot. Summ. J.)  The discharge of IRs into Commonwealth waters thus violates the Clean Streams Act.  35 P.S. § 691.1 et seq.; see id. § 691.301 ("No person or municipality shall place . . . , . . . or continue to discharge . . . into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act.").

9

ME2's construction has repeatedly caused the release of sediment-laden stormwater into Pennsylvania waters.  Typical of largescale projects, this occurs when rainfall mixes with soil disturbed by construction and then runs off to adjacent wetlands and waters.  Such discharges often follow unusually large storms or the failure of sediment and erosion control measures.  (Mariner East 2 Pipeline Project: Expert Report of Paul Martin and William Ettinger in Support of Defendant at 3, Ex. XX to Pls.' Mot. Summ. J.)

### ME2's Permitting Process

Before Sunoco broke ground, it had a series of pre-application meetings with DEP, the only entity with authority to issue permits for the Project.  (Def.'s SUMF ¶ 11; Murin Aff.  ¶ 17.).  The Department recommends such meetings for "large-scale linear infrastructure construction projects that cross multiple counties and multiple regional offices of the DEP."  (Murin Aff. ¶ 16.)  At these meetings, DEP describes the application process and advises which permits are suitable for a particular project.  (Id. ¶ 16.)

Sunoco and DEP met in March, May, and August of 2015.  (Id. ¶ 17.)  It is not disputed that the Department had previously determined that under § 1342(l)(2) and its implementing regulations, oil and gas pipeline projects are exempt from NPDES stormwater permitting.  (Id. ¶ 15); see 25 Pa. Code. § 102.5(c).  Pennsylvania law provides such "project[s] shall obtain an E&S Permit under this chapter prior to commencing the earth disturbance activity."  25 Pa. Code § 102.5(c).  DEP thus advised Sunoco that its project was "exempt from the Clean Water Act's NPDES permit requirements," and the Department would not issue NPDES permits for ME2.  (Murin Aff. ¶ 15.) Rather, the Department directed Sunoco to obtain a Pennsylvania E&S permit, "not an NPDES permit, which is not the type that the Department issues for oil and gas construction projects."  (Murin Aff. ¶ 18; see Def.'s SUMF ¶ 12; Pls.' Resp. to Def.'s SUMF ¶ 12.)  Sunoco

10

applied as DEP directed.

Sunoco's E&S permit applications were reviewed extensively.  DEP conducted five public hearings and received thousands of comments, including lengthy remarks from Plaintiffs on Sunoco's permit applications.  (Id. ¶¶ 20–21.)  One commenter asked whether Sunoco must obtain an NPDES permit for ME2.  (Id. ¶ 22; see Ex. 2 ¶ 2 to Murin Aff.)  In response, the Department stated—as it did during the ME2 pre-application meetings—that "Sunoco did not need to obtain an NPDES permit for the project under applicable federal and state regulations, but rather that the Department would issue E&S permits for the project."  (Murin Aff. ¶ 22.)  Plaintiffs had previously lobbied DEP to issue NPDES permits for other pipeline projects.  (Id. ¶ 23.)  Once again, the Department "informed [t]he Delaware Riverkeeper that instead of obtaining an NPDES permit, the construction of oil and gas facilities, including pipelines, is regulated by an E&S Permit under Chapter 102 of the Department's regulations."  (Id. ¶ 24.)  DEP rejected Plaintiffs' arguments on the other projects, maintaining its longstanding position that pipeline construction is subject to Chapter 102 E&S permitting alone.  (Id.; Pls.' Resp. to Def.'s SUMF ¶ 28.)

Most significantly, because DEP had long determined that E&S and NPDES permits impose virtually identical "regulatory and technical requirements for the erosion and sediment controls," and protect water resources equally, the Department would have refused to grant an NPDES permit for ME2 had Sunoco requested one.  (Murin Aff. ¶26; see id. ¶ 25, 27.)  DEP so informed Sunoco during their pre-application meetings.  (Id. ¶ 25.)

**ME2's Permits**

DEP and the Army Corps of Engineers issued permits to Sunoco before it began constructing the Pipeline.  DEP issued three individual E&S permits.  (Def.'s SUMF ¶ 20; Pls.' Resp. to Def.'s SUMF ¶ 20; Ex. 4 to Def.'s Mot. Summ. J.)  Unlike their "general" counterparts,

individual permits include special conditions and do not enjoy expedited review, thus affording greater protection to streams and wetlands. (Murin Aff. ¶ 27; Pls.' Resp. to Def.'s SUMF ¶ 22; Mariner East II Expert Report by Christopher Antoni at 17, Ex. 7 to Def.'s Mot. Summ. J.)

Pursuant to its Chapter 105 Program, DEP also issued to Sunoco seventeen water obstruction and encroachment permits: one for each county through which ME2 would pass. (Def.'s SUMF ¶ 65; Pls.' Resp. to Def.'s SUMF ¶ 65.) Such permits require developers, *inter alia*, to take special precautions if their construction might affect waterways, take restorative measures should pollution occur, and keep DEP informed of problems.

Sunoco's Chapter 105 permits contemplate that the use of HDD might cause IRs of drilling fluid to wetlands. (Sunoco Chapter 105 Permit at 12–13, Ex. 9 to Def.'s Mot. Summ. J.) The permits incorporate Sunoco's IR Contingency Plan: if HDD causes IRs, drilling stops while Sunoco immediately investigates and notifies DEP. (Id.; see HDD Contingency Plan at 1); see also 25 Pa. Code § 78a.68 (prescribing requirements for oil and gas pipeline HDD). Because the Department treats IRs "as a compliance matter, subject to the Department's enforcement authority," IRs do not trigger NPDES permitting obligations. (Murrin Aff. ¶ 29.)

Finally, Sunoco obtained from the United States Army Corps of Engineers "three joint permits for wetlands and stream impacts" under Section 404 of the Clean Water Act. (Def.'s SUMF ¶ 66; Pls.' Resp. to Def.'s SUMF ¶ 66; see Defendant's Section 404 Permit, Ex. 10 to Def.'s Mot. Summ. J.); see 33 U.S.C. § 1344. Section 404 permits allow "the discharge of dredged or fill material into navigable waters at specified disposal sights." 33 U.S.C. § 1344(a). ME2's use of HDD to cross waterways triggered this requirement. (Section 404 Permit at 1.) Like its Chapter 105 permits, Sunoco's Section 404 permits incorporate the Company's IR Contingency Plan. (Def.'s SUMF ¶ 68; Pls.' Resp. to Def.'s SUMF ¶ 68.)

**ME2's Regulation**

The Parties do not dispute ME2's history of permit violations and IRs, which Plaintiffs document thoroughly and DEP details on its website.  See Pa. Dep't of Envtl. Prot, Mariner East Pipeline II (last visited Apr. 14, 2020), https://tinyurl.com/sfsk7j9.  I will set out the compliance problems germane to this case.

 Pennsylvania regulators stopped ME2's construction four times.  For example, in a March 2018 Emergency Order suspending work, the Public Utility Commission noted that the construction "caused a number of DEP violations" and compromised private water supplies.  (Id. at 40, 34.)  DEP and Sunoco have entered into five Consent Assessments of Civil Penalty, with the Company paying some $866,783 in fines.  (See Pls.' SUMF ¶ 69; Defendant's Resp. to Pls.' SUMF ¶ 69 & n.2; Exs. B–D, SS, RR to Pls.' Opp'n.)  Pursuant to these Consent Assessments, the Department: penalized the Company for sediment-laden discharges resulting from its failure to follow the best practices required by its E&S permits; catalogued dozens of IRs; and identified harms to private water supplies.  (See, e.g., Exs. B & RR to Opp'n.)  In none of these Assessments did the Department find that Sunoco violated water quality standards, which govern only public waters.  See 33 U.S.C. § 1313.

From May through September 2017, DEP issued some twelve Earth Disturbance Inspection Reports.  (See Exs. E–Q to Pls.' Mot. Summ. J.; Pls.' SUMF ¶¶ 29–41.)  These documented the release of sediment-tainted stormwater despite protective measures (e.g. silt fences and socks, wash racks, and water bars), in violation of Sunoco's E&S permits.  In none of the Reports did the Department find that these discharges violated water quality standards.

Plaintiffs identify numerous drilling fluid IRs that flowed from the ME2 construction site.  Sunoco does not dispute them; the Company itself reported many of them to DEP.  (See, e.g.,

3/16/18 IR Violation.)  These violations show Sunoco's noncompliance with its HDD Contingency Plan.  As with Sunoco's sediment-laden stormwater violations, however, the IR notices do not suggest that the Company violated Pennsylvania's water quality standards.

### IV.    PROCEDURAL HISTORY

On April 10, 2018, Plaintiffs sent a Notice of Violation and Intent to File Suit to Sunoco, DEP, and the EPA.  (Ex. A to Pls.' Mot. Summ. J.); see 33 U.S.C. § 1365(b)(1)(A).  After the 60-day notice period, Plaintiffs filed a Complaint.  (Doc. No. 1.) On August 16, 2018, they amended, alleging that Sunoco: (1) failed to obtain an NPDES permit for its storm water discharges, in violation of, *inter alia*, the CWA and Pennsylvania's Clean Streams Act; (2) violated the same laws by discharging pollutants into Pennsylvania's waters without NPDES permits; (3) violated Pennsylvania's water quality standards; and (4) violated Pennsylvania's wetland water quality standards.  (Doc. No. 12.)  Plaintiffs sought injunctive relief and imposition of $37,500 civil penalties for each day of these violations.  (Id. ¶¶ 47–49); see 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

On August 29, 2018, Sunoco moved to dismiss the Amended Complaint for lack of jurisdiction and failure to state a claim.  (Doc. No. 16.)  I dismissed Counts III and IV because "Pennsylvania's water-quality criteria 'essentially define[] pollution; it does not in and of itself prohibit pollution.'"  (Order, Doc. No. 28 (quoting Commw. of Pa. Dep't of Envtl. Prot. v. Perano, No. 2010-016-CP-L, 2011 WL 6934392, at *11 (Pa. Envtl. Hrg. Bd. Dec. 21, 2011)).)  I otherwise denied Sunoco's Motion.  (Id.)

On September 13, 2019, both Parties moved for summary judgment.  (Doc. Nos. 45, 47.) Sunoco has also moved to exclude the testimony of Plaintiffs' Expert, Mark Gallagher.  (Doc. No. 46.)  The matter has been fully briefed.  (Doc. Nos. 48–54, 56.)

## V.     DISCUSSION

Plaintiffs' Amended Complaint and subsequent contentions are less than clear.   They concede that Sunoco was not required to obtain an NPDES stormwater permit at the outset of ME2's construction.   (See Pls.' Opp'n 21, 23 (discussing § 1342(l)(2) exemption).)   Rather, they apparently argue that the Company was obligated to obtain the permit after construction began. (Id. 23 ("[A]s Sunoco has permitted discharges other than 'stormwater runoff composed entirely of flows which are not contaminated' it was obligated to obtain an NPDES permit." (quoting 33 U.S.C.   §   1342(l)(2))).)    It thus initially appears that Plaintiffs have simply ignored DEP's admonition that "[i]f Sunoco had applied for an NPDES permit for the [ME2] construction project, the Department would not have issued it."   (Murin Aff. ¶ 25.)   They have not.   Rather, Plaintiffs seek to underscore the gravamen of this dispute—that DEP's permitting decisions were erroneous:

> The law requires what the law requires and it is not the province of Sunoco, or even
> the Department, to decide when and under what circumstances it will comply with
> the law.

(Pls.' Opp'n 1–2.)   Indeed, Plaintiffs devote the bulk of their submissions to lengthy and detailed arguments as to why the Department should have required Sunoco to obtain an NPDES permit. (See, e.g., id. 3–8; Pls.' Mot. Summ. J. 21–31.)

Yet, Plaintiffs nowhere explain what Sunoco should have done in response to DEP's interpretation of the regulations it administers and its unambiguous directions to Sunoco.  Plaintiffs themselves did not object to those directions until years later (with the filing of the instant action). In fact, Plaintiffs initially challenged only the substance of the DEP-issued E&S permits, never arguing that DEP mistakenly required only a state  permit.  See Notice of Appeal, Clean Air Council v. Commw. Pa. Dep't Envtl. Prot., EHB Docket No. 2017-009-L (Feb. 13, 2017). Plaintiffs apparently now believe that the CWA obligated Sunoco to challenge the Department's

decision, presumably by suing the Department, the sole entity authorized to issue permits. Once again, the contention refutes itself.

First, Plaintiffs offer no authority—and I can find none—obligating Sunoco to sue DEP in the circumstances presented. To the contrary, the law obligated the Company to follow the Department's directions. Moreover, it is evident that DEP's permitting decisions—closely monitored and supervised by the EPA—warrant some degree of deference. Indeed, even if reviewed *de novo*, DEP's actions plainly were correct. Finally, imposing liability on the Company for failing to seek a permit that DEP would have refused to issue defies reason and fairness.

### A. Deference to DEP

Although not discussed at any length by either Party, agency deference plays a role in my decision, especially as Plaintiffs ask me both to accept their reading of the law, and to supplant DEP's enforcement of its permits. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 60 (1987). Plaintiffs argue vigorously against DEP's longstanding policy of issuing E&S rather than NPDES permits for oil and gas pipeline construction. See also 25 Pa. Code § 102.5(c) (requiring E&S permits for pipeline projects). Yet, "state agencies [with] environmental expertise . . . are entitled to 'some deference' with regard to questions concerning their area of expertise," including questions of relevant federal law. Arizona v. City of Tucson, 761 F.3d 1005, 1014 (9th Cir. 2014). That deference is warranted here, where the EPA, while retaining close supervisory authority, has recognized DEP's expertise by affording it exclusive authority to issue permits, and has not questioned DEP's permitting determinations. See 33 US.C. § 1342(a); Del. Riverkeeper Network v. Sec'y Penn. Dep't of Envtl Prot., 870 F.3d 171, 181 (3d Cir. 2017); Buffalo Twp. v. Jones, 778 A.2d 1269, 1276 n.8 (Pa. Commw. 2001); see also Tri-Realty Co. v. Ursinus College., 2013 WL 5298469, at *12 (E.D. Pa. Sept. 19, 2013). ("There is a

public interest in deferring to state or regulatory agencies such as PADEP in matters for and as to which they have actual knowledge or particular expertise."); Pub. Interest Research Grp. of N.J. v. Yates, 790 F. Supp. 511, 514 (D.N.J. 1991) ("This court should give considerable deference to the judgment of the enforcing agency."); cf. Comfort Lake Ass'n v. Dresel Contracting, Inc., 138 F.3d 351, 357 (8th Cir. 1998).

In these circumstances, I will afford some deference to DEP's determinations, which, as I discuss below, were more than reasonable.  See Del. Riverkeeper, 870 F.3d at 181; Buffalo Twp., 778 A.2d at 1274, 1276 & n.8.

### B.      Sediment-Laden Stormwater Discharges

Once again, both sides agree that Sunoco was not required to obtain NPDES stormwater permits at the outset of ME2's construction.   Stormwater runoff from oil and gas pipeline construction falls squarely within the § 1342(l)(2) exemption.  (See Pls.' Opp'n 21; id. 23 ("[I]f Sunoco had constructed the Project in an environmentally-responsible manner in accordance with the law, with stormwater runoff composed entirely of uncontaminated flows, the Project would fall within the [§ 1342](l)(2) Exemption and an NPDES permit would not be required for the construction of the Project.")); 33 U.S.C. § 1342(l)(2) (exempting from NPDES permitting "discharges of stormwater runoff from . . . oil and gas exploration . . . which are not contaminated"); id. § 1362(24).  In Plaintiffs' view, ME2's *sediment-laden* stormwater runoff was outside § 1342(l)(2)'s exemption because: (1) by its terms, the exemption does not protect "contaminated" stormwater runoff; (2) under an EPA implementing regulation, otherwise exempted stormwater runoff requires an NPDES permit if it contributes to water quality violations. I disagree.  The DEP's contrary determinations and decision to issue E&S permits were plainly correct.

First, under the statute, stormwater runoff becomes contaminated (and thus subject to NPDES permitting) by "contact with . . . any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations." 33 U.S.C. § 1342(l)(2). It is undisputed that sediment runoff can include only "overburden" materials. See Philip O'Reilly v. Commonwealth, 2001 WL 96045, at *9–10 (Pa. Envtl. Hr'g Bd. Jan. 3, 2001). Plaintiffs thus contend that ME2's sediment runoff in fact includes "overburden" and so is contaminated. The law says otherwise. Implementing regulations define "overburden" as "any material of any nature, consolidated or unconsolidated, that overlies a mineral deposit, ***excluding topsoil or similar naturally-occurring surface materials*** that are not disturbed by mining operations." 40 C.F.R. § 122.26(b)(10) (emphasis added). The record confirms that ME2's sediment runoff contains only topsoil and surface materials disturbed during construction. (See, e.g., 5/15/17 Earth Disturbance Report, Ex. E to Pls.' Mot. Summ. J.; 8/21/19 Consent Assessment, Ex. B to Pls.' Opp'n.) The runoff is thus not "contaminated" under the statutory exemption and not subject to NPDES permitting.

Plaintiffs' regulatory argument fares no better. Once again, the EPA has defined contamination for purposes of § 1342(l)(2) (which, as I described above, functions as an "exception to the exemption"):

> (iii) The operator of an existing or new discharge composed entirely of storm water from an oil or gas exploration, production, processing, or treatment operation, or transmission facility is not required to submit a permit application in accordance with paragraph (c)(1)(i) of this section, ***unless the facility***:
> . . . .
> (C) ***Contributes to a violation of a water quality standard***.

40 C.F.R. § 122.26(c)(iii) (emphasis added). Invoking this regulation, Plaintiffs argue that during ME2's construction, Sunoco discharged sediment-laden stormwater that contributed to water quality standard violations, rendering the oil and gas exception inapplicable.

The plain text of the regulation forecloses Plaintiffs' argument. The "exception to the exemption" covers discharges from only a "facility." 40 C.F.R. § 122.26(c) ("unless **the facility** . . . [c]ontributes to a violation . . .") (emphasis added). Although the completed, operating ME2 Pipeline will be a "facility," its *construction*—the source of the challenged discharges—is not. See, e.g., *facility*, Webster's Ninth New Collegiate Dictionary 444 (1990) ("something (as a hospital) that is built, installed, or established to serve a particular purpose"). Indeed, consistent with the English language, the EPA uses the term facility to refer to fixed structures. See, e.g., 40 C.F.R. § 122.29(a)(5) (defining "facilities or equipment" as "buildings, structures, process or production equipment or machinery which form a permanent part of the new source and which will be used in its operations"). The agency characterizes construction, however, as "site preparation work" and "placement, assembly, or installation of facilities or equipment." Id. § 122.29(b)(4).

Plaintiffs' contrary argument is unpersuasive. They look to 40 C.F.R. § 122.2, a lengthy provision that includes descriptions and definitions of innumerable terms of art, including "*facility or activity*":

> *Facility or activity* means any NPDES 'point source' or any other facility or activity (including land or appurtenances thereto) that is subject to regulation under the NPDES program.

Plaintiffs contend that the EPA thus deems facility and activity "interchangeable." (Pls.' Opp'n 9 (discussing 40 C.F.R. § 122.2).) This is, again, incorrect. Section 122.2 prescribes that a "*facility or activity*" is something subject to NPDES requirements. See 40 C.F.R. § 122.2. This general description cannot rewrite the exception to the exemption (40 C.F.R. § 122.26(C)), which refers to water quality violations from a "facility" alone, not from a "facility or activity." See Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000) ("[T]he role of the judicial branch is to apply statutory

language, not to rewrite it.").

Moreover, even if "facility" and "activity" are somehow synonymous, Plaintiffs have failed to show that Sunoco's sediment-laden stormwater discharges have "contribute[d] to a violation of a water quality standard." 40 C.F.R. § 122.26(c)(iii)(C). It is undisputed that sediment-tainted stormwater runoff into a body of water does not itself constitute a water quality violation. (See Pls.' Opp'n 34–35.) Rather, DEP determines that such a violation occurs only if the agency has first found "discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life." 25 Pa. Code § 93.6. DEP has made no such finding with respect to waters affected by Sunoco's sediment-laden stormwater discharges. Plaintiffs nonetheless argue that various Earth Disturbance Reports and Consent are legally equivalent to a DEP finding that ME2's sediment-laden discharges caused a water quality violation. Yet again, Plaintiffs' contention refutes itself.

The Clean Water Act does not authorize federal courts, in the absence of agency action, to make a predicate water quality violation finding. The only CWA provision that explicitly ties NPDES permitting to water quality violations—the so-called residual designation authority—states that municipal and industrial stormwater discharges, which are generally exempt from NPDES permitting, nonetheless require permits when "***the Administrator or the State***, as the case may be, ***determines*** that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 33 U.S.C. § 1342(p)(2)(E) (emphasis added). This provision explicitly requires a predicate regulatory finding of a violation. See id. The statute itself thus refutes Plaintiffs' suggestion that the CWA authorizes me to make such a finding in the first instance. Cf. Conservation Law Foundation v. Hannaford Bros., 327 F. Supp. 2d 325, 334–35 (D. Vt. 2004) ("Nowhere does the CWA provide the district

courts with this authority" to find predicate water quality violations.); <u>see also</u> <u>Morris v. City of</u>

<u>Santa Cruz</u>, 1994 WL 514032, at *2 (N.D. Cal. Sept. 6, 1994).

Finally, even if I were authorized to make such a predicate finding, there is no evidence

that ME2's sediment-laden discharges violated water quality standards.  Once again, Pennsylvania

law provides that "[w]ater may not contain substances attributable to point or nonpoint source

discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be

protected or to human, animal, plant or aquatic life."  25 Pa. Code § 93.6.  DEP has never found—

and Plaintiffs have failed to show—that the sediment-laden discharges associated with ME2

violated this standard.  <u>See</u> <u>Achenbach v. Commonwealth</u>, 2005 WL 3872381, at *4 (Pa. Envtl.

Hr'g Bd. May 25, 2005) (discussing petitioners' failure to show water quality violation).  In two

of its Assessments, the Department concluded that Sunoco's sediment-laden runoff adversely

affected *private* water supplies, which are not governed by CWA permitting.  (<u>See</u> 8/2/18 Consent

Assessment ¶ S; 7/24/17 Consent Assessment ¶ H, Ex. SS to Pls.' Mot. Summ. J.) Moreover, the

Assessments are not competent evidence because, by their terms, their findings may not be used

in later proceedings.  (<u>See, e.g.</u>, 8/2/18 Consent Assessment ¶ 3(b).)  The Earth Disturbance

Reports also include no water quality violation finding.

In sum, Plaintiffs' argument that Sunoco needed NPDES permits for its sediment-laden

stormwater discharges fails as a matter of law.  Sunoco's stormwater releases are exempt under §

1342(l)(2).  The regulatory exception to the exemption—for water quality violations—does not

apply to ME2's construction.  Even if it did, Plaintiffs cannot show Sunoco contributed to a water

quality violation.

In these circumstances,  I may properly defer to the DEP's determinations.  Even if I were

to afford  no  deference  to  DEP's  interpretation  of  the  CWA  and  implementing  regulations,

however, I would nonetheless arrive at the same conclusion: ME2's construction did not require

NPDES stormwater permits.

<strong>C.      Inadvertent Returns</strong>

Finally, Plaintiffs argue that Sunoco discharged "industrial wastes" into Pennsylvania

waters "without the appropriate NPDES permit." (Am. Compl. ¶¶ 180–81.) Because it appears

that Plaintiffs first raised this contention at summary judgment, Sunoco argues that it is waived.

(Defs.' Mot. Summ. J. 9 n.7). I agree. See <u>Associated Gen. Contractors of Cal. v. Cal. State

Counsel of Carpenters</u>, 459 U.S. 519, 526 (1983); <u>Commw. of Pa. ex rel. Zimmerman v. PepsiCo.,

Inc.,</u> 836 F.2d 173, 181 (3d Cir. 1988)). In any event, the contention is meritless.

DEP determined that:

> [a]fter the issuance of permits to Sunoco, any discharge of sediment-laden
> stormwater or inadvertent returns of drilling mud ("IRs") would not have required
> an NPDES permit at that time. Instead, those matters are handled as a compliance
> matter, subject to the Department's enforcement authority.

(Murin Aff. ¶ 29.)

Plaintiffs argue vigorously that DEP *could* have determined that Sunoco's IRs required

NPDES permitting from which they were not statutorily exempt. See <u>Tri-Realty Co. v. Ursinus

College</u>, 124 F. Supp. 3d 418, 458 (E.D. Pa. 2015); <u>see also</u> 33 U.S.C. § 1342(l)(2). As I have

discussed, however, DEP—the sole entity with authority to issue NPDES permits—does not

agree. Once again, the Department has not issued *any* NPDES permits for pipeline projects since

Congress exempted them in 2005. (Murin Aff. ¶¶ 12, 15, 18.) DEP reaffirmed this position during

ME2's public comment period. (<u>Id.</u> ¶¶ 24, 25.) That is why DEP advised Sunoco to apply for E&S

permits, which impose nearly identical requirements to those prescribed by NPDES permits. (<u>Id.</u>

¶ 26.) Moreover, because DEP treats IRs as a matter of compliance with E&S permits, it exacted

significant penalties from Sunoco for noncompliance with these permits. (Murrin Aff. ¶ 29; <u>see,</u>

22

e.g., 4/27/18 Consent Assessment (fining Sunoco $355,622 for IRs).)

Plaintiffs do not dispute this description of DEP's reading of the regulations it administers. Once again, I may defer to that reading.  See City of Tucson, 761 F.3d at 1014; Tri-Realty Co., 2013 WL 5298469, at *12.  Indeed, the manner in which Plaintiffs have proceeded in this matter underscores the need for deference.  Plaintiffs' expert testified that he was unaware of DEP ever issuing an NPDES stormwater permit for a pipeline project, that he could not name which (if any) NPDES permit would be appropriate for IRs, and that he knew of no substantive differences between E&S and NPDES permits.  (Deposition of Mark Gallagher 27:7–15, 110:23–111:15, Ex. 5 to Def.'s Mot. Summ. J.)  Plaintiffs neither petitioned the EPA Director to require Sunoco to obtain a NPDES permit, nor argued in their Environmental Hearing Board appeal of Sunoco's Chapter 102 and 105 permits that DEP should have issued NPDES permits.  See  40 C.F.R. § 122.26(f); Notice of Appeal, Clean Air Council v. Commw. Pa. Dep't Envtl. Prot., EHB Docket No. 2017-009-L (Feb. 13, 2017).  Rather, they resolved their appeal by accepting a role on DEP's "workgroup" formed to assess E&S permitting requirements.  Stipulation of Settlement, Clean Air Council v. Commw. Pa. Dep't Envtl. Prot., EHB Docket No. 2017-009-L (July 26, 2018).

Only later did Plaintiffs initiate this citizen suit, raising many of the same discharge allegations that Sunoco had already settled with DEP, and challenging DEP determinations to which Plaintiffs had previously raised no protest.  (Compare Am. Compl. ¶¶ 136–50, with Ex. A to 4/27/18 Consent Assessment).  Such litigation tactics do nothing to protect the environment. Nor is Plaintiffs' apparent effort to revisit and supplant the Department's enforcement actions appropriate.  This is certainly why the Supreme Court has admonished that "the citizen suit is meant to supplement rather than to supplant governmental action." Gwaltney, 484 U.S. at 60; see id. ("'[T]he Committee intends the great volume of enforcement actions [to] be brought by the

State,' and that citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'") (quoting S. Rep. No. 92–414, at 64 (1971)); Comfort Lake,138 F.3d at 357 (State enforcement actions are "entitled to considerable deference if we are to achieve the Clean Water Act's stated goal of preserving 'the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution.'" (quoting 33 U.S.C. § 1251(b))).

I will not disturb the Department's entirely reasonable interpretation of the Act, its implementing regulations, and Pennsylvania law.  Nor will I overturn DEP's corresponding permitting decisions, especially in the absence of authority requiring NPDES permits for IRs.

Moreover, imposing liability on Sunoco for failing to secure NPDES permits would offend basic principles of fairness and effect an absurd result.  Plaintiffs have produced nothing to refute Murin's averment that if Sunoco had applied for an NPDES permit, the Department would have refused to issue one.  (Murin Aff. ¶¶ 18, 25.)  "The law does not require the doing of a futile act." Wisc. Res. Prot. Council v. Flambeau Min. Co., 727 F.3d 700, 710 (7th Cir. 2013) (quoting Ohio v. Roberts, 448 U.S. 56, 74 (1980), abrogated on other grounds by Crawford v. Washington, 541 U.S. 36 (2004)); Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1530 (11th Cir. 1996) (Strict application of NPDES permitting requirements cannot trigger penalties where "compliance with such a standard is factually impossible.").  Requiring Sunoco to apply for a permit that DEP would not issue would be compelled futility.

Finally, penalizing Sunoco in these circumstances would violate due process: "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." F.C.C. v. Fox Telev. Stations, Inc., 567 U.S. 239, 253 (2012).  As created by Congress and the Commonwealth, the Act and its implementing regulations provide that the Company was obligated to follow DEP's directions, not challenge them.  See 33 U.S.C. § 1342(b)–(c); Del. Cty. Safe

24

Drinking Water Coal., Inc. v. McGinty, 2007 WL 2213516, at *4 (E.D. Pa. July 31, 2007). Plaintiffs base this citizen suit on their contention that, contrary to those explicit provisions, Sunoco was obligated to challenge the Department's actions—presumably by taking the agency to court after it declined to issue NPDES permits.  The contention refutes itself.  I will not fine Sunoco some $40,000 for every day it obeyed the Department.

## VI.     CONCLUSION

In sum, it is evident that the real object of Plaintiffs' ire is DEP for allowing Sunoco to construct ME2.  I have closely reviewed DEP's determinations and concluded that they are not only entitled to deference, they are correct.  ME2's construction has been subject to the fullest regulation.  Neither the law nor the courts may penalize Sunoco for acceding to that regulation.

I will grant Sunoco's Motion and dismiss Counts One and Two of the Amended Complaint with prejudice.  I will deny Plaintiffs' Motion for Summary Judgment and Sunoco's Motion *in limine*, both of which are moot.

An appropriate Judgment follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

April 16, 2020                                                    _____

Paul S. Diamond, J.